BRECHT v. LAW UNION & CROWN INS. CO.

(Circuit Court, D. Oregon. March 4, 1907.)

No. 3,039.

INSURANCE—AVOIDANCE OF POLICY FOR BREACH OF CONDITION—TITLE OF INSURED.

The owner of a sawmill property, including the mill, machinery, and logs and lumber, the personalty being subject to a chattel mortgage, entered into a contract with the chattel mortgagee by which he purported to convey and transfer to said mortgagee all of the property, both personal and real, with authority to take possession and to operate the mill and to sell any and all of the property, the owner agreeing to execute conveyances of the same as required by him. In consideration of such contract the grantee agreed to pay certain indebtedness of the owner, including his own, and to apply to that purpose all sums received from the operation of the mill or sales of the property, after deducting expenses, the surplus, if any, to be paid over to the grantor. *Held*, that such contract was not a mortgage, but a trust agreement or deed, which vested the absolute title to the property in the grantee, and that it avoided a policy of insurance previously issued to the grantor on the property containing a provision that it should be void if his interest in the property should be or become other than unconditional and sole ownership.

At Law.

On October 5, 1904, defendant issued to A. S. Douglass, R. P. D. Douglass, and A. B. Douglass, partners doing business under the firm name of St. Johns Lumber Company, its policy of insurance, whereby it insured the firm against loss or damage by fire, as per printed slip attached to the policy, as follows:

$1,500   On frame wet log saw mill building and additions, adjoining and communicating, situate on the east bank of the Willamette river, St. Johns, Multnomah county, Oregon.

$1,500   On engines, boilers, and connections.

$1,500   On fixed and movable machinery.  *  *  *

$500   On lumber; all while contained in and piled upon the within described premises.

Other concurrent insurance permitted.

Loss, if any, hereunder is hereby made payable to Daniel Brecht.

This slip is attached to and made a part of Policy No. 1328859 of the Law Union & Crown Insurance Company, issued to St. Johns Lumber Co.

On May 19, 1905, the defendant issued to the St. Johns Lumber Company another policy of insurance, whereby it insured the latter company against loss or damage by fire, as per printed slip attached thereto, as follows:

$750 00   On frame wet log saw mill building and additions adjoining and communicating, situate on the east bank of the Willamette river, St. Johns, Multnomah county, Oregon.

$750 00   On engines, boilers, and connections.

$1,000 00   On fixed and movable machinery.  *  *  *

Loss, if any, payable to Daniel Brecht.

Other concurrent insurance permitted.

This slip is attached to and made part of policy No. 1329006 issued to St. Johns Lumber Company by the Law Union & Crown Insurance Company.

Another slip attached to the same policy contains the following stipulation: "It is warranted by the insured that whenever any of the following named parts of the plant described in this policy, to-wit: Saw Mill is idle or not in operation, from any cause whatever, competent watchmen shall be employed and due diligence used to keep a continuous watch both day and night in and immediately about said part of the plant. If any of the above named parts

is idle or not in operation for a period of more than thirty (30) days without the written consent of this Company this policy shall be void."

The two policies are otherwise identical, as respects their provisions and conditions, and each contains the following stipulation at the foot thereof: "This policy is made and accepted subject to the following stipulations and conditions, printed on the back hereof, together with such other provisions, agreements or conditions as may be indorsed hereon or added hereto, and no officer, agent, or other representative of this company shall have power to waive any provision or condition of this policy except such as by the terms of this policy may be the subject of agreement indorsed hereon or added hereto, and as to such provisions and conditions no officer, agent, or representative shall have such power or be deemed or held to have waived such provisions or conditions unless such waiver, if any, shall be written upon or attached hereto, nor shall any privilege or permission affecting the insurance under this policy exist or be claimed by the insured unless so written or attached." And upon the back thereof the following, among others:

"This entire policy, unless otherwise provided by agreement indorsed hereon or added hereto, shall be void * * * if the interest of the insured be other than unconditional and sole ownership; or if the subject of insurance be a building on ground not owned by the insured in fee-simple; or if the subject of insurance be personal property and be or become incumbered by a chattel mortgage; or if, with the knowledge of the insured, foreclosure proceedings be commenced or notice given of sale of any property covered by this policy by virtue of any mortgage or trust deed; or if any change, other than by the death of an insured, take place in the interest, title, or possession of the subject of insurance (except change of occupants without increase of hazard) whether by legal process or judgment or by voluntary act of the insured, or otherwise."

"If, with the consent of this company, an interest under this policy shall exist in favor of a mortgagee or of any person or corporation having an interest in the subject of insurance other than the interest of the insured as described herein, the conditions hereinbefore contained shall apply in the manner expressed in such provisions and conditions of insurance relating to such interest as shall be written upon, attached or appended hereto."

At the time of the issuance of the policy the plaintiff was a creditor of the St. Johns Lumber Company, being secured by chattel mortgages upon the personalty covered by the insurance. On August 25, 1905, the copartners above named, doing business as the St. Johns Lumber Company, as parties of the first part, entered into a contract with Daniel Brecht, the plaintiff, as party of the second part, in language following: "In consideration of the foregoing the party of the second part does hereby assume and agree to pay all outstanding indebtedness owing by the said parties of the first part, incurred in connection with the said milling business; the said outstanding indebtedness, with the exception of certain sums due for labor, and including the amounts due by the parties of the first part to the party of the second part, is shown by the items hereto attached and marked 'Exhibit A' and hereby expressly made a part hereof, and aggregating in amount the sum of sixteen thousand three hundred and thirty dollars and thirty-six cents ($16,330.36); and in addition thereto the party of the second part assumes and agrees to pay the obligations of the said first parties for labor performed in connection with their said milling business now unpaid and amounting approximately to the sum of three hundred and seven dollars ($307). It is hereby expressly understood and agreed that the second party does not assume or agree to pay any sums in addition to those represented on said 'Exhibit A' and the said sum due for labor aggregating approximately the sum of $307.00. Immediately upon the execution of these presents the party of the second part shall be given and take possession of said mill and all thereof and everything connected therewith, and said accounts receivable, lumber, and stock on hand, and all other items connected with said milling business or used or intended to be used therein, and shall, at his own election, operate said mill in such manner as he may see fit; nothing herein contained, however, shall be construed so as to compel the second party to operate said mill; but the second party may operate the same for such length of time and in such way as he may

see fit; and the second party may, at any time he may see fit, and for such prices as he may be able to obtain, dispose of any and all of said property. All debts contracted by the second party in the operation of said mill or in any wise connected therewith shall be deducted from the receipts of operation or from the money received from the collection of said accounts or the sale of said property. The said second party may, at any time he sees fit, and for such prices as he may see fit, dispose of any and all of said property in bulk or otherwise. The said party of the second part shall keep true and correct account of all expenditures made by him in connection with the operation, management and sale of said property, and of all sums received by him in any way connected therewith, and apply the same: 1st. To the expenses of operating said mill and other expenses incurred by him, howsoever. 2nd. To the payment of all of the said debts now due by said first parties and herein mentioned, including the claims and demands of the second party against the first parties, and after the full payment of all said obligations and debts, any surplus remaining shall be at once paid over to the parties of the first part. The parties of the first part shall, upon the demand of the second party, execute and deliver to the second party, or to whomsoever the second party may designate, such bills of sale, assignment or conveyances as the second party may deem proper to fully vest in the second party or such person as may be designated by him, the entire legal and equitable title to all of the property now owned by said parties of the first part."

The property was destroyed by fire September 1, 1905, and plaintiff sues, by two counts, to recover upon each of the policies of insurance. As one of the defenses to each of the causes of action it is alleged that plaintiff went into immediate possession of the property under the contract above set out, and that, by reason of said contract and the action of the parties concerned in pursuance thereof, the policies were rendered void, and that defendant was thereby relieved of liability thereunder.

William T. Muir, for plaintiff.
Snow & McCamant, for defendant.

WOLVERTON, District Judge (after stating the facts). The questions presented in this case of which I deem it important to take note are the same as those presented in the case of Vancouver National Bank v. Law Union & Crown Insurance Company (just decided) 153 Fed. 440, save one, which I will now determine. That question is whether, by virtue of the contract of August 25, 1905, between the St. Johns Lumber Company and the plaintiff, a change was effected in the interest, title, or possession of the property, the subject of the insurance, such as renders the policies of insurance upon which the action is based void under the stipulations and conditions therein contained. In the view I take of the question, its solution depends upon the proper interpretation of the contract. It is contended, on the one hand, that the instrument was intended by the parties as an unconditional conveyance of the property from the vendor to the vendee, in trust for the purposes therein stated, or, if not so determined, then that it operates as an assignment of the property irrevocably for the benefit of the creditors of the St. Johns Lumber Company; while, upon the other hand, it is strongly insisted that the writing portends a chattel mortgage only, and that its true purpose was merely to secure the payment of the debts of the St. Johns Lumber Company.

The instrument should be construed by its four corners, so as to give all parts of it operation, if possible, and this in connection with the attending circumstances and conditions as shown by the testimony

introduced at the hearing. If it was the purpose to convey the property to Brecht as a security for the payment of his demands, along with the demands of other creditors of the St. Johns Lumber Company, then it should be deemed and considered a mortgage; and, by whatever name it may be called, equity looks beyond that, and determines the true intent and purpose of the parties, as gathered from the instrument itself and the attending conditions under which it was executed. If, however, it was the purpose to vest the ultimate legal title in Brecht, in trust though it may be, to be disposed of as his judgment might suggest, for the purpose of procuring funds whereby to meet the obligations outstanding against the St. Johns Lumber Company; and that it was merely intended that the vendor should be entitled to the surplus only of what might be left after disposing of the property and applying the proceeds to the debts, then the instrument should be considered as a deed of trust simply, and not as a mortgage. Mr. Justice Bean has noted the distinction between a mortgage and a deed of trust, in the case of Ladd v. Johnson, 32 Or. 195, 200, 40 Pac. 756. He says:

"A mortgage or deed of trust in the nature of a mortgage is intended as security for the payment of money, or for the performance of some collateral act, and becomes void upon such payment or performance; * * * while a deed of trust of the character under consideration here is an absolute and indefeasible conveyance of the whole of the grantor's title, for the purpose expressed. The former, whatever the form of the instrument, or whatever name may be given it by the parties, creates a mere lien, while the latter conveys title."

On the other phase of the question, as to whether this contract should be considered an assignment for the benefit of the creditors, the distinction is clearly made by Caldwell, Circuit Judge, in the case of Bartlett v. Teah (C. C.) 1 Fed. 768. He says:

"A mortgage does not invest the mortgagee with an absolute and indefeasible title. The equitable title, called the 'equity of redemption,' remains in the mortgagor. The mortgage is a security for the debt, and creates a lien upon the property in favor of the creditor. There is no difference in legal effect between a mortgage with a power of sale and a deed of trust executed to secure a debt, where the power of sale is placed in a third person. Both are securities for a debt. Both create specific liens on the property; and in both the equitable title or right of redemption remains in the debtor, and is an estate or interest in the property that the debtor may sell, or that may be seized and sold under judicial process by his other creditors, subject to the lien created by the mortgage or deed of trust. * * * An assignment for the benefit of creditors is well defined to be 'a transfer by a debtor of some or all of his property to an assignee in trust, to apply the same, or the proceeds thereof, to the payment of some or all of his debts, and to return the surplus, if any, to the debtor.' Burrill on Assignment, § 2. The terms of the instrument in this case bring it exactly within this definition, and stamp it as an assignment for the benefit of creditors, and not a mortgage, or deed of trust in the nature of a mortgage. Unlike a mortgage or deed of trust, it was not given by way of security. There is no defeasance clause giving the grantor the right of redemption. It does not create a lien on the property, but conveys it absolutely for the purpose of raising a fund to pay debts; and, if valid, it passed the absolute title, legal and equitable, to the grantors in the deed, subject to the trust, and placed the same beyond the reach of the debtor, as well as her creditors, until the purposes of the trust were satisfied. When the debts were paid, the debtor had a right to the surplus, but until that was done she had no legal or equitable interest in the property, or its proceeds, that could be sold or incumbered or seized on attachment or execution by her creditors."

This case has the sanction of Shiras, District Judge, in a much later case, reported as Appolos et al. v. Brady et al., 49 Fed. 401, 1 C. C. A. 299. Special reference is there made to the Arkansas authorities, which hold very clearly to the same principle. Richmond v. Mississippi Mills, 52 Ark. 30, 11 S. W. 960, 4 L. R. A. 413; Robson v. Tomlinson, 54 Ark. 229, 15 S. W. 456. See, also, Holliday v. Benoist, 37 Mo. 501. The like distinction as between a mortgage and an assignment for the benefit of creditors is stated in Bank v. Crittenden, 66 Iowa, 240, 241, 23 N. W. 646, 648, as follows:

"If the conveyance is to a trustee, and the debtor intends to divest himself, not only of the title to the property, but of all control over it, if it is intended as an absolute conveyance of all of his property, and is made for the purpose of securing a distribution of its proceeds among his creditors, or a portion of them, in legal effect it is an assignment for the benefit of creditors, no matter what name or designation the parties may have given it. On the other hand, if the intention of the debtor is merely to secure his debt to one or more of his creditors, and the conveyance is not intended as an absolute disposition of his property, but he reserves to himself a right therein, the conveyance will be treated as a mortgage, even though the debtor is insolvent at the time, and it covers all his property, and but a portion of his debts are secured by it."

See, also, Sabichi et al. v. Chase, 41 Pac. 29, 108 Cal. 81.

The same doctrine has been announced in the Oregon Supreme Court in the case of Monteith v. Hogg, 17 Or. 270, 20 Pac. 327. Mr. Justice Lord, in speaking for the court, says:

"An assignment whereby the debtor conveys all his property for the benefit of his creditors amounts to a complete cession or surrender of his property to his creditors. It operates to vest in the assignee the legal title to the property, but the beneficial interest is in the creditors, the cestuis que trust. He is seized not for himself, but for the creditors, and as a consequence the moment he is seized the beneficial, substantial interest passes out of him into them. Necessarily the converse of this proposition must be true as to the assignor's interest in the property assigned. After the assignment he is devested of the legal title to the property assigned, and the only possible interest he can have is wholly uncertain and contingent, and according to the nature of the transaction only results after the payment of the debts, and is confined to such residuum as may remain of the unappropriated property or its proceeds. In a word, until the purposes of the trust are satisfied, the assignor has no legal or equitable rights in the assigned property."

Now, we will turn to the instrument itself, and determine its character. By the first provision, after reciting the consideration, the contract purports to grant, bargain, sell, convey, assign, and set over unto the plaintiff all of the property (describing it in detail), together with all moneys, claims, demands, lumber on hand and in stock and logs intended to be cut into lumber. Then, following the habendum clause, it is stipulated that, in consideration of the foregoing, the plaintiff assumes and agrees to pay all outstanding indebtedness owing by the lumber company incurred in connection with the milling business, and also all of certain labor claims amounting to the sum of $307, as exhibited by a schedule attached. By the third paragraph it is stipulated that the plaintiff shall be given possession of the mill, and everything connected therewith, and of all the property mentioned and described in the contract, and that he shall have the right, at his election, to operate the mill in such manner as he may deem proper, and shall sell any of the property at any time, as he may see fit, for such prices

as he may be able to obtain for the same; that an account of all the debts contracted in connection with the operation of the mill subsequent to the transfer shall be kept, and the amount thereof deducted from the money received from the collection of the accounts or the sale of the property. It is further provided that, after the sale of such property, the plaintiff shall pay, first, the operating expenses of the mill; and, second, all the debts and demands due from the lumber company to said plaintiff, and, after the full payment thereof, the surplus, if any remain, shall be paid over to the company. Then follows the provision that the lumber company shall, on demand, at any time, execute and deliver to the plaintiff, or whomsoever he may designate, such bills of sale, assignments, or conveyances as the plaintiff may deem proper to fully vest in him, or in such other persons as he may designate, the entire legal and equitable title to all the property owned by the lumber company. There is nothing upon the face of this instrument, or in the plain reading thereof, to indicate in any way that it was designed or intended as a mortgage. It purports to convey an absolute title, without reservation or right of redemption. The power of sale in the vendee is absolute, and not conditional in any way upon the vendor's failure in payment of the indebtedness specified. While the application of the proceeds is fixed by the conditions of the trust, no declaration is to be found that the sale should be void upon the payment of such demands; nor is there anywhere to be found in the writing any condition suggestive of a mortgage agreement, or of a deed of trust in the nature of a mortgage. Aliunde the written agreement, one of the partners of the firm of the St. Johns Lumber Company testifies that all claims and demands against the firm were intended to be included in the schedule attached, but that a few were omitted through oversight; and, when asked what was the purpose of executing the instrument to Brecht, he replied:

"It was for the protection of Mr. Brecht and myself and the creditors. We got considerably involved, as the lists show there, and was behind in our payments. We hadn't collected up our bills as we should, and first thing we knew we were cramped. And there was one of the creditors was about to commence an action against us, and I was afraid it would sacrifice the property. So Mr. Brecht and I talked it over, and he agreed, if I would secure him in some way, that he would stand between me and those creditors, and pay them off as we could work it out of the business. And the result was we got up this agreement. And this creditor, the one that was liable to give us the trouble, he paid him off the first one, some $2,300 or $2,400."

Prior to the time of entering into this agreement Brecht held two chattel mortgages against the property for the security of his demands, amounting to more than $7,500. This constitutes all the testimony that has any bearing upon the purpose for which the contract was executed. The only statement of the witness explanatory of the purpose is that Brecht agreed that, if he (the witness) would secure him in some way, he would stand between witness and those creditors, pay them off as they should work it out of the business. The result was the agreement, and to that we are referred to determine how Brecht was to be secured. The matter aliunde does not therefore materially help us. There was no understanding tantamount to a defeasance, and no agreement changing the relations of the parties except as expressed in the con-

tract itself. The last paragraph was designed apparently as a provision for further assurance as to title. In view of the conditions, therefore of the contract, construed in the light of the testimony, so far as it sheds any light, and in further consideration that the contract in the form in which we find it supersedes two chattel mortgages, which were concededly such, it seems to me that there can be but one conclusion, namely, that it was intended solely as a trust agreement or deed to enable Brecht to dispose of the property, and vested the title absolute in him. Whether it be called a trust agreement or trust deed, or a deed of assignment for the benefit of creditors, is of no practical importance, as in either event it carried the title, and does not constitute a mortgage or mere lien for the security of Brecht.

It is insisted by the plaintiff that, if there was left in the vendor an insurable interest in the property, then it could not be considered that there was a change of interest, title, or possession within the purview of the policies. But I cannot agree to this proposition. It is very clear that a bond for a deed, under the authorities, will transfer the equitable title, and yet there remains in the vendor, perhaps, an insurable interest, or an interest which the insurance companies might legally insure. Yet, as has been seen in the Vancouver Bank Case (just decided) 153 Fed. 440, where the equitable title has been transferred, that in itself works a change of interest such as will void the policy under the clause invoked here; but, under the present contract, I am of the opinion that no insurable interest remained in the St. Johns Lumber Company. Lazarus v. Commonwealth Ins. Co., 22 Mass. 76.

Another view is here suggested, in addition to the arguments made in the Vancouver National Bank Case, that it was permissible for the plaintiff to show that it was the intention of the parties to make the loss payable to Brecht "as his interest may appear," and not to him absolutely. I am of the opinion that this would result in a change in the written contract itself, and is therefore not competent under the rules of evidence. As the contract reads, the loss is made payable to Brecht without else; and, under the stipulation, as has been seen in the former case, Brecht was appointed, with the consent of the company, to receive the amount of the loss, and is in reality made a trustee for that purpose, and thus he is authorized to sue in his own name and recover the whole of the loss. No condition being imposed upon him to show that he has any interest whatever in the subject of insurance, it is only necessary for him to establish the condition that the loss was made payable to him. Whereas, if the loss was made payable to him "as his interest may appear," he would have to show such interest as he had, and could not recover otherwise. So I say that any testimony which would have a tendency to show an intention of the parties contrary to what is written would be inadmissible, as it would vary the terms of the contract.

The other two questions insisted upon here, namely, that plaintiff is without an insurable interest, and that the slips attached to the policies contain all the conditions affecting the insured, are settled in the Vancouver National Bank Case.

These considerations lead to a rendition of judgment for the defendant, and the complaint will therefore be dismissed.